This morning is MLH TEK v. NISSAN, et al. Ms. Maynard. Thank you, Your Honor. Mr. Chief Judge, may it please the Court. My name is Deanne Maynard, and I represent Appellate MHL TEK. I'd like to focus my opening time this morning on two points. First, as to the 496 and 966 patents, MHL owns those patents as a matter of law because they were expressly reserved from the 1993 assignment. And second, as to the 516 patent, the District Court adopted an erroneous construction of the term cylindracious, using a layperson's definition of the term cylinder. At a minimum, as to both issues, there are disputes of fact for a jury to resolve. First, as to the ownership of the 496 and 966 patents, in the JA at page 848 is the first sentence of that makes clear that the patent application... What page are you referring to? I'm at JA 848, Your Honor. And in paragraph 3, it says reserved rights. The patent application, which is defined in the assignment as application 379, includes claims relating to the following items. So the reserved rights provision expressly recognizes that the patent application that is the subject of the assignment includes claims relating to the proprietary technologies of animatronics, which are defined as the communications link, a radio frequency transceiver and algorithm used in the service unit and the sensor unit, and a piezo resistance rubber pressure sensor for use in the sensor unit. And those claims and rights related to those technologies are expressly reserved from assignment by the following sentence. This assignment shall not cover any rights in the proprietary technologies. And it's important to understand that... But isn't there an exclusive non-royalty bearing license for those? For any developed MF, the monitoring, tire monitoring pressure system? No license that ever became operative, Your Honor. In the development agreement, it's contemplated that when the TPMS system that is, was to be the product of the development agreement, which never came to fruition, if the TPMS system had developed and received a patent, then there would have been granted an exclusive license to the proprietary technologies. But the development agreement is conditional, and nothing in the development agreement expressly resigning license is conditional on their performing, ME performing its portion of the contract, which was payment of money. And there's no dispute that they never paid all the money and that the TPMS system that was to be the subject of the development agreement never came to pass. Well, the development agreement was dated May, March 1st, 1993. Correct? Yes, Your Honor. The assignment was dated November 1st, 1993. Yes, Your Honor. The assignment followed the particular development agreement. Was subsequent to the development agreement. And there's a provision in there that says for good and valuable consideration in the assignment provision. The assignment provision for consideration on page 846, in consideration of $1 and other valuable consideration. And other valuable consideration. I presume that that makes it consideration which is subject to legal analysis and sufficient consideration for the transfer of the assignment? Yes, I would assume so, Your Honor. But by the terms of the assignment agreement itself, it doesn't assign the patent for the TPMS that is the subject of the development agreement. And the other side doesn't contend that the TPMS that was to be developed in the development agreement was ever assigned. The assignment language in the assignment, which is on A847, paragraph 2, says, except as set forth in section 3, which is the reserve rights provision I started with, the entire right title and interest, domestic and foreign, in and to the inventions and discoveries set forth in the patent application. And that's the 379 application. And it's important to understand that the 379 application ultimately divided into three patents. Two of which are the 496 and the 966, which we say were not assigned because they concern animatronics proprietary technologies. And the third, the 938, which was assigned. And in the first sentence of the reserved rights provision, it says the patent application includes claims relating to the animatronics proprietary inventions. So in other words, the parties understood this was a broad reservation of rights. And it reserved the claims in the 379 application that relate to the proprietary technologies. What was a broad reservation of rights? Well, how is it defined? The reservation of right, Your Honor, is the paragraph 3. And as I noted, the first sentence, this is on 848 of the JA, says the patent application includes claims relating to the following items. And it defines the states, the proprietary technologies are what I read before. And then the next sentence says, this assignment shall not cover any rights to the patent application that concern the animatronics proprietary inventions. And McLaughlin shall, therefore, not be given any rights in the animatronics proprietary agreement. And, Your Honor, it's important to note, this is just- Well, what's in that sentence, though? You've got to read the whole paragraph. Yes, Your Honor. The next sentence says, pursuant to the development agreement, McLaughlin shall, future tense, have an exclusive irrevocable royalty-free license to use the animatronics proprietary inventions to make, use, and sell the TPMS. That's the TPMS that was to be the subject of development under the development agreement, but was never developed. But the TPMS was filed in the patent application. No, Your Honor. The TPMS consisted of a sensor unit, a communications link, a display module, and a service unit, right? So those are the four elements of the TPMS. Yes, Your Honor. The reserved automatic, the animatronics proprietary interest was the communications link, the service unit, and the sensor unit, and a piezo-resistance rubber pressure sensor for use in the sensor unit. So those were the four elements which were reserved and identified, but still given a royalty-free exclusive license for use in the TMS. So how is that not transferred over to ME? Okay, a couple of responses. One, the shall have a royalty-free license. That's a conditional future tense. The defendants do not argue, and they never have contended, and the district court didn't say that that is a current license that is operative. The development agreement contemplated at some point in the future, if the TPMS that was the subject of the development agreement were developed, they shall get a license. Developed in what sense? That a patent would issue? Those are reduction of practice. Once the patent application was issued, that's a reduction of practice. Well, the 379 application, Your Honor, is not the TPMS that was to be developed under the development agreement. Under the development agreement, at A, the definitions in A813, TPMS is defined, and in first paragraph in the definitions section on A813, TPMS shall mean the tire pressure monitoring system to be developed here under in accordance with the parameters and specifications. So that TPMS system was never developed, and I don't understand the defendants to contend that it was. So your position is that they didn't assign the patent rights because the subsequent patents, the two you're talking about, embraced or included the proprietary inventions that had been reserved? Yes, Your Honor. Okay. Let me just ask you. I mean, you focus mainly on communications link, correct? And communications link is defined in the assignment. Yes, Your Honor. Do you agree that the communications link is defined, doesn't include the sensor unit or the display module? It doesn't include the display module for certain, and it doesn't include the sensor unit. Okay. That's right. The communications link, though, is, and this goes back to your question, Judge Gaharza, the 379 application and the 496 in particular did not result in a claim that matches the four elements that you read from the definition of a TPMS. Instead, the independent claims 1, 7, and 17 in the 496 patent track the definition of communications link in the assignment, which is expressly reserved. Ms. Maynard, the development agreement says that in the event the patent for the TPMS system includes some of animatronics property, that McLaughlin will give them a royalty-free license. Doesn't that make it clear that ME, not animatronics, has rights to the TPMS system that includes the animatronics proprietary technology? Two points about that, Your Honor. One, they will get a royalty-free license for use in the TPMS. And again, that's defined on 8.13 in the development agreement as being the tire pressure monitoring system to be developed here under, and no one claims that was developed. The development agreement was not brought to fruition. It's not the systems that are claimed. Two, the communications link is defined itself as a system. And so the fact that the 496 claims are system claims... I'm trying to understand why you're making a distinction between the TPMS and TPMS, which is discussed so broadly throughout this development agreement. And it's clear that ME, not animatronics, is going to possess the rights to that system even if it includes your property. Yes, that system. But that system never came to fruition. So that's not the patents being sued on today. That's the important point about the TPMS. And the district court lost that distinction, and defendants tried to light over that distinction by claiming that because the 496 relates to systems claims, and those systems could be considered tire pressure monitoring systems, that ME therefore obtained the rights to it under either the assignment or the development agreement. Is there something that allows us to see that the TPMS is different from TPMS? What is it that gives us some clear distinction that the TPMS is something that was never developed? Well, they aren't claiming that it was. On A813, TPMS is expressly defined term in the development agreement to mean shall mean the tire pressure monitoring system to be developed here under. And then the only assignment of rights is the 1993 assignment. In the distinctions it draws between what it assigns and what it doesn't assign, don't turn on this distinction between TPMS and non-TPMS, either the or a. The assignment assigns the inventions and discoveries set forth in the patent application. And so the question is whether the patents at issue here, the 496 and the 966, were reserved from that because they did issue from the 379, a divisional of the 379, whether they were reserved. And it's important to understand, I think, that the 379 application resulted in only three patents. So the systems claims that became the 496 patents do relate to the communications link using the ground plane as a vehicle. And those are the only claims that this first sentence in the reserved rights provision could be referring to because there aren't any individual component communications link claims in the first sentence in the 379 application. Are you saying that the 496 and the 966 patents aren't set forth in the 379 application? No, I'm saying they are. And they divided out into the 496 and the 966 patents. And the remaining claim, claim 38 of the application, became the 938. And it was a claim for the display module. And the display module wasn't reserved and was assigned. So you can see that this tracks claim 7. If I can just walk you through an example. Claim 7 in the 379 application is on page A4879 of the JA. It became claim 7 of the 938 when it was divided out as a divisional because there were multiple inventions. It is one of the claims referred to in the first sentence of the reserved rights clause. The patent application includes claims relating to the following items. And it is the communications link. It claims a sensor, an electromagnetic path, a transmitter, a receiver, and a monitor. And that tracks the definition in the assignment on page A847 of communications link. A transmitter, integrated circuit components, a receiver, the communications protocol and software and the methodology used therein. And you can see that it is a communications link when you look at the specification, figure 4. And the specification is the same both in the 379 application and in the 496 patent. And figure 4 is on page A72 of the JA. And it is the communications link 12. And it includes a transmitter. Sorry, Your Honor. I presume that the parent application would be used, at least the written specification would be the same for all the divisional applications. Yes, Your Honor. Otherwise, you'd have some new matter and couldn't be a divisional, right? Yes, Your Honor. So, where are you headed with this saying it's all the same? They are all the same. Because the written description for all of the parent applications have to be the same. Subsequent divisions have to be the same to the parent. Yes, Your Honor. Claims can be different. What I'm trying to establish, can I just try again? What I'm trying to establish is the reserved rights provision expressly states that there are claims in the 379 application that are reserved. And so, if you look at the 379 application, it resulted in three patents. One set of patents directed to the communications link, which is the 496. Communications using the ground plane of the vehicle, which was one of animatronics proprietary. And the extrinsic evidence establishes it was. And if the court thinks that the documents aren't clear on their face, then at least we should get a jury trial on this issue. Because certainly the documents don't clearly transfer these rights. Because the systems and components distinction that they draw is untenable. It doesn't carry through. The communications link itself is defined in the development agreement as a system. And paragraph 9 in the development agreement refers to the patent that might be obtained by animatronics as a system. In paragraph 9 of the development agreement. So, at a minimum, we should be entitled to a jury trial as to the meaning of these documents and as to what was transferred. Can I just, your time has pretty much run out, but let me just move you to, I think, what was the second point that you were going to cover about the cylindrical, generally cylindrical. I must tell you that, frankly, I mean, you're relying on the testimony of Dr. Moon and Dr. Lee, or Dr. Joy, I'm sorry. It seems to me their testimony comes down to them saying that squares and rectangles can be cylinders. That seems a little nonsensical to me. So, do you want to give it a shot? Yes, Your Honor. Thank you very much for taking me there. I think the best place to look is in the Joint Appendix at page 2358 in the pages before and after that. These are part of Dr. Moon's reports, but these are diagrams she's taken from other sources. So, this isn't just our expert say-so that cylinder has a broader meaning than what you or I think of as a cylinder. So, a cylinder can be a square or a rectangle. That's the sum and substance of your argument about how we ought to define generally cylindrical. A cylinder can be something more expansive than what one thinks of as a soda can. And that's the lay definition. Well, I mean, there's a lot of distance between can be something more than a soda can and can be square or rectangle. Their testimony is that a cylinder can be square or rectangle. The figures shown here are more than just their testimony. They're drawn from textbooks about what people of skill in the art consider to be cylinders. So, yes, Your Honor, I do think an enclosed space can be a cylinder. And if you think about it, Judge Prost, if you take a soda can and you lay it on its side and you squash it just slightly, you're going to have what you or I envision as a rectangle with some curvature. So, it's just not that far-fetched to say that something beyond a soda can can be generally cylindrical. And that's all that we need. And the district court, though, applied a lay person's definition contrary to this court's precedent in further refining. So, your definition of generally cylindrical is a rectangle with some curvature? That's the definition of generally cylindrical? Shapes with sufficient curvature in an enclosed space. I mean, our expert gave things that wouldn't be a cylinder. But what the judge erred here is limiting it to right circular cylinders. There would be no need to have a term right circular cylinder if cylinder only encompassed right circular cylinders. But it doesn't. It encompasses more shapes than that. The shapes I saw in the record show a cylindricatious extension from a rectangular box. Now, are you saying that T-shaped device is entirely cylindricatious? Are you referring to the pictures on page 2359? Probably. That's also in our expert's report and it's also drawn from another source not our expert's drawing. And yes, your honor, we're saying that shapes that have two different generally cylindrical portions put together can be in their entirety generally cylindrical. By the way, I'm wondering as well why we're arguing about a term which is has an ordinary meaning to a lay person. Why are you presenting expert testimony on that? Why do we have experts on the meaning of claim construction? The experts can inform a claim construction but once you have a claim construction and it's uncontested we don't need experts anymore, do we? Well, here the judge further refined his claim. The parties that agreed it was generally cylindrical, your honor, but the judge went on and engaged in another further claim construction and in doing so he ignored it. That's fine. He can explain it in lay terms to the jury. Why do you bring in an expert to explain the judge's lay explanation to the jury? Well, I think there are two ways to look at it, your honor. I think going back to your first question the judge erred by using a lay person's definition of cylindration. You didn't contest his claim construction of cylindricatious, did you? Did you accept his claim construction? Yes and no. Well, if it's a yes, this is over, isn't it? Yes, we agreed with the other side that cylindratious could be interpreted as generally cylindrical. We disagreed with the judge's further refinement of his claim construction for the first time in a summary judgment opinion where he interpreted that to be limited to a right circular cylinder and that was inconsistent with what one of skill and the art would understand and that's precisely what this court says one should do which is take into consideration for a technical term like this, in an electronics enclosure, what someone of skill and the art would consider the right shape would consider this limitation to mean. It was either, your honor... But you agreed that the term generally cylindrical could go to the jury. Yes, but he didn't let it go to the jury because he further refined it so he engaged in, you can look at it either way No, he just said that no reasonable jury could find that these shapes were cylindrical at all. No, your honor, I think in his summary judgment opinion, he says I further refine my claim construction and he limited it to a dictionary definition of right circular cylinder and we claim that is either an error of law as an error of expert testimony or it should have gone to the jury and he should have allowed our expert to testify. We have no complaint with the agreed upon definition, your honor. At least I understand your point. Ms. Maynard, we've given you some extra time. Yes, I appreciate it, your honor. We'll give you two minutes of rebuttal and Mr. Glitzenstein should have an additional seven minutes if he needs to use it. Keeps the time even. Thank you, your honor and may it please the court Kirk Glitzenstein, counsel for Portia and Subaru in this matter. I'd like to start with the agreements in place that do govern the standing issues that cut across not only MHL's appeal but also our cross appeal that those agreements also encompass the 516 patent, the one that was subject to Judge Ward's non-infringement consideration. He says the TPMS that is discussed was never developed and is something not addressed at all in this, should not have been addressed by the district court in reaching the decision that there's no jurisdiction in this case. Thank you, your honor. I was hoping to start there actually. I think there are three responses to that. Number one, they concede that the 938 patent which did issue from the 379 application is governed by the scope of this assignment. So, that point right there addresses and refutes their argument that this assignment agreement and that the 379 patent is somehow different from the TPMS that was supposed to be assigned. They concede that at least some pieces of the 379 application belong to McLaughlin Electronics. So, that door has already been opened and in fact this is plain from the recitals in the assignment agreement itself in the appendix A846 it actually again directly addresses this point that McLaughlin has been making. It actually starts out by addressing the fact of the development agreement and at the end it says that pursuant to that agreement McLaughlin would receive any patents issued with respect to that system. So, this is the definite article point they keep making. And then the next recital goes on to refer to the 379 application and then the very next recital says in accordance with the development agreement animatronics desires to assign certain patent rights to McLaughlin. And then we go through the agreement itself and the actual assignment language is unambiguous. It says the 379 application actually the inventions and discoveries in the 379 application, a broad notion of assignment and ownership, go to McLaughlin subject to this limited reservation that's called out in paragraph three. In other words, the inventions and discoveries in the 379 application that deal with communications link and those two other categories, you would agree were not assigned. Absolutely your honor. Our position has been that throughout the district court below and remains so on appeal. The carve out is very, very narrow here. They took great pains to identify the specific technologies that would be reserved to animatronics. And why doesn't the carve out cover cover this then? Is it a matter of claim construction and is it a factual question? The district court judge obviously concluded that the carve outs were not part and parcel of the two patents that are at issue, right? The carve out, I mean there wasn't a sufficient carve out in other words, they assigned the sum and substance of what was included in the 466 and the other patent right? The 496 and the 966, you're right. Those patents are directed, the claims of those patents are plainly directed to the TPMS system or a TPMS system broadly and both this agreement and the development agreement make very clear that the TPMS, no matter what else, the TPMS was going to be the property of McLaughlin. The development agreement sets that out clearly and the development agreement is sort of an interesting chronology here the development agreement starts out by drawing But the TPMS, the whole system isn't necessarily what's been assigned it's whatever is described and invented, the inventive feature of the 379. That's correct your honor and it's really the question is whether the piece that animatronics tried to keep to itself was broad enough to encompass the system. That's their argument that somehow by virtue of the carve out that extended to these very three specifically defined and specifically enumerated points that any claim that in any way touches on those even if they are one of many many features recited in the claims that therefore somehow those claims were reserved to animatronics. There's a simple answer to that there's a very simple answer at the time when this carve out language was drafted, claims were pending in the 379 patent. Some of those claims recited systems if in fact animatronics had any intent whatsoever to reserve system level inventions to itself it could have done so very simply by just simply saying claims 1 through I'm making this up 1 through 38 are not subject to reservations by animatronics. Let me sort of step back on this. What the parties did in March of 1993 was they were entering into a joint development agreement and they quite wisely did the right thing which is let's not fight about who invented what or when it was invented but let's instead draw some lines in the development agreement about what would be developed pursuant to this joint arrangement. Both parties brought something to the table McLaughlin brought technology and money animatronics brought technology that's in the recitals of the development agreement that was prospective. They didn't know what they were going to develop and so broadly what they said was the TPMS level inventions, those go to McLaughlin and the components, the individual things that are made that make up a TPMS those things will be reserved to animatronics but not the whole system. That went to McLaughlin. In fact McLaughlin would even get in the field of tire pressure monitoring would get an exclusive fully paid up royalty free license to use those components. What makes this a little confusing however is the definition of communication link talks about a system right? Is that a different system than the system you're talking about? It is your honor. I mean the issue could be framed in terms of a subsystem because it's clear that the TPMS. Wait so you're saying we should define the system under the definition of communications link to mean a subsystem. I don't think anything turns on the issue of what a system is. I mean this is a, at one level that's I think a semantic point that they've tried to inject into this. When we say system we mean the tire pressure monitoring system. In the development agreement it said that the tire pressure monitoring system, the whole thing would be assigned to McLaughlin. Now within that the agreement was also very clear that one component of the TPMS was a communication link and that too was a system although a system with much narrower scope. The communication link is simply the system that takes the tire pressure information that the sensor creates and then sends it over to the receiver side where the display module then can display it to the driver. So yes the communication link is described as a system but it is described as a system that is but one component of the overall TPMS. And so what happened was over the course of the ensuing six months five months, excuse me, between March and August of 1993 they filed a patent application, the 379 patent application. Now come November 1, 1993 they have something clear to talk about. Now they can frame an assignment precisely and they can say these specific things, everything in this agreement goes to excuse me, everything in this patent application goes to McLaughlin with the limited three exceptions. And I want to address those three exceptions. They are the communication link of course but they're also things that are individual subcomponents or pieces of the sensor unit itself. And that point is important for the 516 patent. If in fact animatronics wanted to reserve to itself the sensor unit module which they admit ultimately became claimed in the 516 patent which is the subject of our cross appeal. If they had wanted to carve out the sensor unit there was a very simple way for them to do so which is just simply to say right in this reserved rights animatronics also reserves all rights to the sensor unit. They didn't do that. In fact they took great pains to say we're only reserving to ourselves the piezo resistive piece of this. That's 2020 hindsight. 2020 hindsight you could have gone back and redefined a lot of these terms much clearer. However, let me ask you a question regarding the assignment itself. If in fact the assignment provided for the assignment of the parent patent application the 376 why isn't that part of the record? I'm sorry. It's not part of the appendix. It's not part of the record that we could find. I'm sorry your honor. I think I misheard your question. The patent application which was originally assigned is not which subsequently was divided in the two patent applications is not part of the record with the original claims. Your honor, in terms of the joint appendix your honor is correct. It's not entirely in the joint appendix. There are a number of pieces of it that are cited beginning with A4837 and I think that's as a consequence of the fact that only portions of it were referred to in the briefing. I would note that it was actually the Volkswagen defendants that made this a record. It was not MHL as I recall it making even making the 379 application a record in the joint appendix so we had to bring it in. But is the entire application part of the record below? Yes your honor, it was. It's just not part of the joint appendix for this court. But to your honor's point about this being 2020 hindsight while I understand why that might appear to be so, actually, chronologically it's very clear from comparing the development agreement and the assignment agreement that the scope of the rights that were reserved to animatronics diminished between the time of the development agreement and the assignment agreement which is a very key point here. This is not a matter of hindsight. This is actually a matter of animatronics originally reserved to itself the component level invention and they originally defined the animatronics proprietary inventions in a certain way and they defined those on A814 and what happened over the ensuing eight months is that animatronics reserved less rights in the assignment agreement than it had set out in the development agreement. You know it's funny because I read it the reverse. I read the development agreement as being broader as referring only to patents issued with respect to that system which is incorporated in the whereas clause of the assignment but when you get to the assignment itself it's limited to the inventions included in the 379 application as opposed to this global TPMS system, patents related to that. So I, tell me why I'm wrong but I see it as narrow or more defined the assignment than the development agreement. So the narrowness that I'm referring to here goes to what animatronics kept. So we're talking here. The carve outs. The carve outs. We're talking about a division of rights here. But with respect to what it actually gave, it is more refined or defined in the assignment than it is in the development agreement, correct? Precisely, Your Honor. That was the point I was trying to make. With regard to the 379 application, again no dispute that that application the inventions and discoveries set forth in that application include the 496 and the 966 patent in this case. There's no question about that. What about 516? 516. The 516 patent is also set forth in there and there was a single point in Judge Ward's decision with regard to the standing issue with the 516 patent that I'd like to draw the court to. One issue and it is purely a claim construction issue. And this is Judge Ward's order that's found in the appendix of A44. And it was a single point actually that kept Judge Ward, we submit, from concluding that the 516 patent was also disclosed. And on A45 he says that the quote specifically the 516 patent claims a tire pressure sensor having a housing that includes a valve stem and a pressure Where were you reading on A45? Under discussion? Are you in the first paragraph under discussion or the second? First paragraph under discussion. The second to last sentence of that paragraph. And the key words being the last four words of that sentence. Namely that the pressure transducer has to be quote located within the tire. Close quote. That was a claim construction point. It's clearly a matter of what the scope is of the 516 claims. And it's incorrect. It is an incorrect claim construction that you can read the claims of the 516 patent. They are generic as to whether the pressure transducer is inside the tire or outside the tire. But is that the same point though? What I think is key in Judge Ward's which isn't really dealt with a lot of in the briefing and maybe it's because he claims somebody abandoned certain arguments. What I think is key is the next to the last sentence in the second paragraph. Which is his decision it seems to me was based on his conclusion that the 379 did not disclose all limitations of the 516. And we understand that statement your honor to be a follow on from his claim construction in the first paragraph. So all the limitations in the 516 in Judge Ward's view would include this requirement that the pressure transducer be located within the tire. And we submit as a matter of claim construction there's no support for that. And so we presented him with the detail mapping of how the 516 claims do map to the disclosure in the 516 excuse me in the 397 application. And in the 397 Where is that in the appendix where you mapped out the limitation by limitation comparison? Let me see your honor. I know you have a chart in your brief. We do your honor and I think I'll just get to that. All right. I'm not seeing it in I'm not seeing the reference to the record below on the briefing in which we directed Judge Ward to the corresponding structure. But your view was that when he said the limitations don't line up that was exclusively based on the within the tire analysis he had in the preceding paragraph? We believe so your honor. I mean there was one other issue that was in question below that has not been raised by MHL now on appeal and that's this issue of whether the air that flows in and out that contacts the sensor whether the air that is sensed by the sensor has to be exhausted to atmosphere was an issue below. It hasn't been raised on appeal but we think that Judge Ward in addressing this issue only rested his decision on standing on the location of the pressure transducer not this other issue about whether there's some requirement in the claim for the air to flow to atmosphere. It's kind of hard to figure that out to be certain. I mean he's entitled to a lot of deference here and where he makes the conclusory statement that the 379 doesn't disclose all the limitations of the 516 it's kind of hard to decide whether that's right or wrong necessarily based on what we've got, at least what's been argued here, right? Well, I think the issue though has been framed by MHL in its opposition to our standing point on the 516 and they actually don't even contest the technical part of this. Their position is understood. But we're still reviewing his opinion and not their brief and so it just gives me some difficulty to conclude that he abused his discretion by this determination about the limitations when I'm not seeing it. Now maybe you can figure out where the record sites are for what you're saying here. Your Honor, a very important point here. The standard of review is de novo on this issue. There's no underlying factual issue here. This is purely an issue of claim construction. So I don't believe the court needs to go so far as to say that he abused his discretion in reaching this conclusion. We think that it really is just a matter of whether he made the one sort of the one overly narrowing claim construction that would require that the pressure transducer be located in the tire itself or in the wheel. Was there a clear analysis by Judge Ward taking the 379 application comparing to what was eventually developed in the 516 patent to determine whether or not some of these issues that were disclosed in the original patent application eventually flowed through to the 516 patent? Judge Ward's analysis is only contained in that one order at A44 so it's just that. That's his full and complete analysis of that issue Your Honor. We do think that the fact that MHL isn't suggesting that there is some sort of technical mismatch here between the claims of the 516 and the patent application that was assigned to McLaughlin is significant here. Their responses are just that the scope of the assignment doesn't extend to it because it's not in the same family. But the family requirement isn't found in the assignment at all. It's a little broader than that. And also the carve-out point. The carve-out point we submit simply cannot be squared with the fact that the reserve rights clauses specifically delineate only certain portions of the sensory unit. They can't say we reserve the entire sensory unit when they took pains to specify little small sub-pieces of that like the piezo sensor. We would submit that that would be a contract instruction that would be really at all odds with the plain intent of the parties. But there is a generic carve-out though for communications that communications link is part of the total system. It's not really defined as to what makes it up unless you go back to the original development contract. The communication link is defined in the assignment at 847 and it actually makes very clear that the sensory unit basically hands off the pressure information to the communication link. The communication link is a thing that gets it over to the other side and then there's a display unit. So it contemplates this three separate component architecture if you will. Sensory unit, communication link in the middle, display module on the driver's side. So the communication link doesn't get them there at all. And in fact the reserve rights clause itself says only certain pieces of the sensory unit. And to the question of what the 516 patent is, the other issue there is they say in their briefing that essentially the 516 patent is the use of the wheel as the antenna for transmitting the signal. And that is plainly disclosed in the patent application that was assigned to McLaughlin. They don't dispute that. So what was the inventive aspect of the 516? Well, I mean I think when they originally filed the parent application it was using the wheel as the antenna. Now over the course of ensuing prosecution they couldn't get those broad claims and so had to narrow it to be this cylindrical feature which leads to estoppel consequences on their infringement argument. But so that's ultimately what the 516 patent came to be. So I think the correct answer is broadly they saw it as using the wheel as the antenna but then they had to add in the cylindrical requirement for patentability purposes. But even in their is the use of the wheel as the antenna and this court in the QG products case which we do cite does clearly say that it's not, you don't have to, in construing an assignment that's written as broadly as this assignment to McLaughlin, you're not bound sort of to the rigid sort of written description type approach. We think we prevail on the written description approach but they were intending to assign broad rights. Any final thoughts for us Mr. Glitzenstein? Well your honor, I mean on the 516 infringement issues, we think Judge Ward got it exactly right. There has to be you know, for an issue like this a district court judge must be provided with latitude to address claim terms such as this and reach the very reasonable conclusion that no jury either literally or under the doctrine of equivalence could find infringement. Thank you. Thank you your honor. Ms. Maynard, we restored two minutes. Could you tell us very quickly, have you conceded that the 379 application discloses all of the limitations of the 516? No your honor, absolutely not. Our first argument is that the 516 is not disclosed in the 379 application. Indeed, figure 7, which is the key to the 516 application and is the subject of the cylindricious debate was not in the application of the 379 application. It's a different family of patents and we don't believe it's encompassing. Give me a cite for that in your brief where you contest that there's a a 379 is not is not disclosed all limitations of the 516. Page 25 to 26, the 516 patent is from a different family of patents in the assigned patent application. That's not within the scope of the assignment and that's where we argue that figure 7 is not in the 379 application and the claims in the 516 are drawn to the figure 7 516 application. We do not think it's within the scope of the assignment. If I could just make four quick points about the 496 and the 966 and also goes to the 516. None of the claims of the 496 and the 966 include all four elements of the definition of TPMS in the assignment. None of those claims include a sensor unit, communications link, a display module, and a service unit. So he makes the argument that those claims were a TPMS system as defined in the assignment and that is not right. It's not a narrow carve out. Yes, it defines a proprietary technology specifically but then it reserves any rights that concern those and expressly says any claim that there are claims in the those things. So it's not just claims drawn directly only to those things. In the 496, all the independent claims are in any event drawn directly to the communications link. It is important to keep the distinction between licenses and assignments here and issued only operative document that did anything is the assignment provision and it only assigned those things subject to the broad reservation of rights clause. Any licenses were only going to be attained upon full completion of the development agreement which never occurred. Finally, their reading and my other point, because I really think you ought to address it. You say the specifications are different there on page 25 and 26. No point do you say the claims aren't all the limitations of the claims aren't found in the 379, do you? The precise wording, Your Honor, may not be there. You just say the specifications are different. We would ask that you would affirm the district court judge on his rationale that the 516 was not included within the meaning of the assignment provision. Finally, just to wrap up, their reading of the development agreement and the district judge would make the reserved rights clause mean nothing. Would have reserved nothing to animatronics from the 379 application because the claims all broke down and became the 496, the 966, and the 938. That can't be right. That can't be right. The reserved rights clause expressly says there are claims relating to the 379 application and then expressly reserves any rights that concern those things. Thank you, Your Honor. Thank you, Ms. Maynard.